SLOSS IRON & STEEL CO. v. SOUTH CAROLINA & G. R. CO.

(Circuit Court of Appeals, Fourth Circuit.   February 5, 1898.)

No. 227.

1. CONTRACTS—ADOPTION BY SUCCESSOR.

A contract with a railroad receiver, whereby a coal company was to supply the road with coal for one year at a certain price, stipulated that at the expiration of the year it should be renewable at the option of the coal company. Before that time the railroad was sold under a mortgage given prior to the making of the contract. The purchasers were aware of the existence of the contract, of the price stipulated therein to be paid for coal, and of the date of its expiration, but did not know of the option clause regarding renewal. *Held,* that by continuing to receive coal under the contract until notified by the coal company that the contract would be renewed at the expiration of the year, the purchasers did not adopt said option clause.

2. TRIAL—PROCEDURE IN FEDERAL COURTS—DIRECTING VERDICT.

Rev. St. § 914, providing that the practice in civil causes in circuit and district courts shall conform as near as may be to the practice in like causes in the courts of the state in which the district or circuit courts are held, does not change the rule that the court may direct a verdict for defendant where the evidence is insufficient to warrant a verdict for plaintiff.

In Error to the Circuit Court of the United States for the District of South Carolina.

This was an action at law, by the Sloss Iron & Steel Company against the South Carolina & Georgia Railroad Company to recover damages for breach of contract.   At the conclusion of the testimony the court ordered a nonsuit, and plaintiff brings error.

Augustine T. Smythe and A. M. Lee, for plaintiff in error.

Joseph W. Barnwell and J. E. Burke, for defendant in error.

Before GOFF, Circuit Judge, and PURNELL, District Judge.

PURNELL, District Judge.   This was an action at law to recover $40,000 damages for breach of contract.   In 1893, D. H. Chamberlain was, under orders and decrees of the circuit court for the district of South Carolina, receiver and in possession of the South Carolina Railway Company, its property and franchises.   On the 28th day of July, 1893, the Sloss Iron & Steel Company, plaintiff in error, entered into a written contract with the said Chamberlain, receiver, as follows:

Charleston, S. C., July 28, 1893.

South Carolina Railway Company, Charleston, S. C.: We agree to furnish you all the steam coal purchased by you for one year, commencing August 1, 1893, at ninety-two (92) cents per ton of 2,000 pounds, f. o. b. the mines, for screened coal, and at eighty-five (85) cents per ton of 2,000 pounds, f. o. b. the mines, run of mines coal.   We will give you the privilege of accepting the mine weight or the weights of the Georgia Pacific Railroad Company, as you may prefer, either at the mines or at Birmingham, whichever point they (the Georgia Pacific Railroad Company) select as the point of weighing.   You agree to give us the privilege of extending this contract, at the same prices, one or two years, as we may elect, after August 1, 1894.   It is understood that you want only screened coal, and we agree to ship you that, unless stoppage of our furnaces or other conditions deprive us of a market for our slack, in which case we will ship you run of mines coal from our best mines.   All coal under this agreement to be shipped from the Pratt seam.   (It is understood the railroad company prefers Coalburg coal.)   If run of mine coal does not give you satisfactory results, you shall have the right to buy coal anywhere else, until we again commence to ship

you screened coal. In case of strikes or unavoidable accidents, this contract shall be suspended.

[Signed] .                              Sloss Iron and Steel Company,
                                                By Thomas Seddon, President.

Approved:
[Signed]                                South Carolina Railway Company,
                                                By D. H. Chamberlain, its Receiver.

It was afterwards agreed payments should be made on the 20th of each month. On the 12th of April, 1894, the entire property of the South Carolina Railway Company was sold by the receiver under a decree of the circuit court, and on the 12th of May, 1894, the South Carolina & Georgia Railroad Company, which had been duly incorporated and organized for the purpose of operating said railroad, became the owner, and took possession of the property. The new corporation continued to operate the properties it had purchased, and immediately on assuming control issued circular orders giving notice that the railroads and property of the South Carolina Railroad Company and the South Carolina Railway Company sold under decrees of the circuit courts for the districts of South Carolina and of the Southern district of Georgia, had become its property, of which it had assumed possession on May 12, 1894, continuing in service until further notice the officers, agents, and employés of the receiver, and directing reports to be made to the general manager at Charleston. W. C. Ward was continued as general manager.

In the complaint (paragraph 6) it is alleged:

"The plaintiff further alleges that the defendant, the South Carolina and Georgia Railroad Company, did thereupon duly and legally enter into and make for itself with the plaintiff a contract the same as the contract made with the receiver aforesaid, and that the plaintiff thereupon performed all the obligations resting upon or incurred by it under the terms of said contract."

This allegation is denied, and upon the issue thus made the determination of the controversy between the parties depends. Plaintiff, on July 14, 1894, notified defendant that the privilege of extending the contract for two years would be, or was, claimed as provided in the contract. Defendant "disaffirmed" the contract. Under a special agreement, the purchase of coal was continued without prejudice at the contract price until August 14, 1894, since which date defendant has purchased no coal from the plaintiff. After assuming control of the railroad properties, defendant instructed plaintiff to make out separate accounts against the receiver up to and including May 12th, and against the South Carolina & Georgia Railroad after that date. All the coal received to August 14, 1894, was paid for. The damages claimed are for refusing to purchase coal under the extension clause of the contract as claimed by the plaintiff, under notice of July 14, 1894.

There is no evidence tending to show that any new contract was made between the parties on or after the 14th of May, when defendant assumed control, and commenced to operate the railroad. The circuit judge so held, and, after a careful examination, we find no such evidence in the record. The other question which arises and was discussed is: Did the defendant, being a stranger to the contract between Chamberlain and plaintiff, come in and adopt this contract as its own, with all its terms, so as to be legally bound by it; and especially as to

the clause giving to plaintiff the right to extend the same for one or two years? On May 25th, the general manager asked, by telegram, for more coal than three car loads per day, to which plaintiff's manager replied it could not be furnished. There was much correspondence set out in the record, defendant continuing to ask for more coal, complaining that run of mine coal was shipped at the price of screened coal, and in some letters of the general manager speaking of "the terms of our contract." In a letter under date of June 29th, plaintiff admits coal shipped was run of mines coal invoiced as screened coal, at 92 cents, and asks to be permitted to charge for run of mines coal at that rate on account of strike troubles, etc. Attention is called to the strike clause in this letter. To this, on July 7th, the general superintendent of the defendant corporation replied:

"While it is true that the contract does contain a strike clause, it is also true that this company was offered coal at 85 cents per ton at the time the contract was made with you at 92 cents, a difference of 7 cents per ton on all coal except the run of mines. We certainly cannot pay the screened coal prices for run of mines. While we fully appreciate your efforts, I do not think that you should ask us to pay more than your run of mines prices, which I understand is 85 cents per ton."

On July 14th the president of the plaintiff corporation, in a letter to the general superintendent of the defendant corporation (for the first time so far as the evidence shows), calls attention to the extension clause in the Chamberlain contract, and adds:

"We beg to notify you that we exercise the privilege given, and hereby extend the contract for two years from Aug. 1st, 1894."

The vice president of the South Carolina & Georgia Railroad Company replied from New York, July 16, 1894:

"In behalf of the South Carolina & Georgia Railroad Company, I beg to give you notice that having purchased the property of the South Carolina Railroad Company, and the South Carolina Railway Company under mortgages antedating an agreement made with you July 13th, 1893, relative to furnishing coal to the South Carolina Railway Company, this company does not hold itself bound by the terms of said agreement, but hereby expressly disaffirms the same, and the covenants thereof."

Much correspondence of like tenor followed, plaintiff insisting both parties had recognized the Chamberlain contract as binding; it had furnished coal at a time when there was a strike in the mining district at a loss to itself, and seeking to make a new contract to furnish defendant coal; the president and vice president of the defendant corporation insisting defendant had never adopted or recognized the Chamberlain contract; that the vice president had exclusive control of its contracts after May 12, 1894; that, 10 days after taking charge of the property, inquiry had been made of the general manager as to the coal supply, and he had replied the road was purchasing coal at plaintiff's mines at 85 cents for run of mines coal and 92 cents for screened coal, and that the receiver's contract at these prices expired on August 1, 1894; that immediately written instructions had been issued to the general manager that in no case where a contract had been made with the receiver for supplies should any future supplies be purchased from the parties to such contracts, except upon the condition that the South Carolina &

Georgia Railroad Company was not bound to carry out the terms of the contract, and, in case of refusal to take an order under such conditions, the supplies were to be purchased from other parties;·that it was not until July the terms of the receiver's contract were made known, and then in response to an order that all contracts should be furnished the vice president of defendant corporation; and that any act that could in any way be construed as appearing to recognize the continuance of the contract with the receiver was not only unauthorized but contrary to positive instructions. The correspondence was put in evidence by plaintiff. There was parol testimony tending to show, among other facts, that there was a strike at the Sloss Company's mines from May 12, until August 11, 1894; that all coal shipped during May, until the 25th, was billed to the receiver, when, under the orders of defendants, the accounts were split,—that shipped to May 12th charged to the receiver, and after that to the South Carolina & Georgia Railroad Company; that plaintiff had a record copy of the receiver's contract, and its officers were acquainted with its terms; and that the Sloss Iron & Coal Company made no other contract with the South Carolina & Georgia Railroad Company to furnish coal. At the conclusion of the testimony, the defendant moved the court to instruct the jury to find a verdict for the defendant. A nonsuit was entered by order of the court, and the plaintiff appealed to this court. While there are several exceptions set out in the record, the only question in the case is: Did the South Carolina & Georgia Railroad Company adopt the agreement made between Chamberlain, receiver, and the plaintiff, so as to be bound by all of its covenants? The learned circuit judge decided that it did not, and the appeal brings up this question only for review.

If the agreement or contract was not adopted by an implied contract, or by such acts on the part of the defendant as in law would constitute an implied contract (for there was admittedly no express contract), the ruling of the circuit judge was correct; for then plaintiff had no cause of action, and a nonsuit was properly entered. The dealings between the parties upon which an implied contract must be based, if such contract was ever entered into, is evidenced by writings, telegrams, letters, and orders. It is well understood that the construction of a written contract is a question of law for the court, and it is also a question for the court, the dealings being in writing, to say whether there was in fact a contract.

Counsel for plaintiff in error quote freely from Wiggins Ferry Co. v. Ohio & M. Ry. Co., 142 U. S. 396, 12 Sup. Ct. 188, and insist it is similar to and decisive of the case at bar. Under the state practice, where the distinction between actions at law and suits in equity have been abolished, and legal and equitable causes are considered by the courts in the same action, we are naturally misled, and lose sight of this distinction. In the federal courts the distinction has not been abolished, and legal and equitable remedies and defenses are administered in separate actions and on distinct principles. A careful examination of the opinion in the citation will show it rests upon a different principle, was a bill in equity, and was decided upon purely equitable principles. It was really a bill in equity for use and occupation, and is, in effect, a decision that the plaintiff in that case, which was a much stronger case

than the one at bar, had no legal remedy.   Mr. Justice Brown, in his statement of the case, says:

"When the railway company became the purchaser at judicial sale of the property, assets, and franchises of the railroad company, it found the latter in possession of a tract of land upon Bloody Island, in the Mississippi river, making use of the same for its track, depots, warehouses, and other terminal facilities, and also sending to and receiving from St. Louis, at this point, its passengers and freight by steamers not its own.   It knew or was bound to know that this property did not belong to the railroad company.   As the record shows that it remained in possession of these premises for the next fourteen years, using the same for some nine years of this time as they had before been used, sending its passengers and freight to and from St. Louis in the boats of the ferry company, and, in the language of the answer, treated the contract as in full force and binding upon them, it must be assumed that it was fully informed of the ownership of such property and the terms of the contract under which it was held and employed by the railroad company."

And, continuing in the opinion, the learned justice's language puts the decision upon purely equitable grounds, as follows:

"It is a well-established principle that the mere purchase of a railway under a foreclosure sale by a new corporation does not of itself make such new corporation liable for the obligations of the old one.   The railway company, then, upon taking possession of the property of the railroad company, was at liberty to renounce the benefit of such contract, if it chose to do so, or to make such further arrangement with the ferry company as they might be able to agree upon.   It did neither, but retained possession of the land.   In view of the fact that the railway company used this property precisely as it had been used, improved it at great expense by filling up low places and securing it from the overflow of the river, graded and paved the river front, erected buildings, paid the annual taxes, and until 1871 [that is, from 1862] employed the ferry company to transport its passengers and freight to and from the city,—in short, in the language of the answer, doing and performing all that the terms of the said contract required the said Ohio and Mississippi Railroad Company to do and perform,—we think it must be held, in a court of equity, to have adopted such contract and made it its own.   Under the circumstances of this case, we agree with the conclusion of the special master that the railway company acquired an equitable estate in the premises, of like character as the legal estate previously held by the railroad company, which estate was, in equity, unimpeachable, and that the railway company and the ferry company sustained the same relation as had previously existed under the deed between the railroad company and the ferry company, or, at least, that both parties are equitably estopped from denying that such was the case."

The case under consideration is not for an equitable claim, or even to recover for any coal delivered, but to recover damages for breach of contract in its most rigid form,—for future loss upon coal which defendant refused to buy.   True, plaintiff claims the terms of the contract were complied with at a loss.   Coal was furnished defendant at time when there was a coal famine in the mining district, and better prices could have been obtained in the open market.   But the strike clause in the contract with the receiver, under which it was acting, provided that in case of a strike the contract "shall be suspended."   If it failed to avail itself of this clause, it was voluntary; and there is no evidence that it was ever called to the attention of the defendant until in June, when complaint was made that the screened coal price was charged for run of mines coal.   When defendant assumed control of the property, it was at liberty to assume or repudiate such contracts as had been made by the receiver.   The receiver's contracts were not binding on the new corporation.   It found plaintiff supplying coal at certain prices, and,

as far as the record shows, this was all the general manager (who was in no way connected with the making of the contract, and had no authority to make a new contract) knew; and he continued to take coal from plaintiff at the same rate for the balance of the year. The strike clause suspended the receiver's contract ipso facto, even if all its terms had been known to defendant. It appears they were not. The defendant, under this state of facts, would be bound only by an implied contract to pay for what it received. This it has done.

The case of Chicago & A. R. Co. v. Chicago, V. & H. Coal Co., 79 Ill. 121, also cited and relied on by plaintiff, was decided on a principle not involved in this case, but there the adoption of the contract was a part of the consideration for the purchase of the road, and the suit was for excess of charges for goods carried by one company for the other. There was no dispute as to the facts, and the service was continued for a considerable time. On an examination of the other cases cited in the brief, we cannot see that any of them are as strong in plaintiff's favor as the case cited at length, above.

Corporations act through their duly-authorized officers. The evidence in this case is silent as to the organization of defendant corporation, except that in the correspondence on the part of the defendant it appears that the vice president was the only officer who had authority to purchase or make contracts for the purchase of coal, and he had no knowledge of the details of the Chamberlain contract, especially of the option clause, until the latter part of July, after plaintiff had given notice of the extension of two years, and the contract had been repudiated by defendant company. The president had no knowledge of the contract, except the price of the coal, and that it terminated on the 1st of August. The general manager does not appear to have had any more knowledge than what he imparted to the president. Nor does it appear that any other officer knew of the provisions of the Chamberlain contract. Upon these facts, the law would not presume that there was a coming together of two minds; nor would reason and justice dictate that there was an implied contract on the part of the defendant to be bound by all of the covenants of the receiver's agreement. If there was a mistake, it was a mutual mistake of fact. If the court is satisfied that, conceding all the inferences which the jury could justifiably draw from the testimony, the evidence is insufficient to warrant a verdict for the plaintiff, the court should say so to the jury. Pleasants v. Fant, 22 Wall. 122; People's Bank v. Aetna Ins. Co., 20 C. C. A. 630, 74 Fed. 507. This is a well-established rule in the federal court. It is essentially different from the rule in the courts of many of the states, but is uniform in the courts of the United States; and it has been decided by this court that section 914, Rev. St., does not require the federal courts to change this rule of procedure so as to conform to the practice existing in the courts of the states. The action of the circuit judge, who presided at the trial of this case, in ordering that the defendant have judgment of nonsuit, was in conformity with the decisions of the supreme court of the United States and the decisions of this court. The learned judge might have directed the jury to have found a verdict in favor of defendant on issues submitted to them as to whether defendant had adopted the receiver's con-

tract as a question of fact, for one so learned in the law would have permitted no other verdict to stand. The judgment of the circuit court is affirmed.