SLOSS IRON & STEEL CO. v. SOUTH CAROLINA & G. R. CO.

(Circuit Court, D. South Carolina. June 17, 1908.)

1. EQUITY—JURISDICTION—ADEQUATE REMEDY AT LAW.

The objection to jurisdiction in equity on the ground that complainant has an adequate remedy at law should be taken on the threshold of the case, and where the defendant has answered to the merits, taken a consent order of reference, and the evidence has been taken before the objection is made, the court will retain the case if at all justified in exercising jurisdiction.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 18, Equity, §§ 173, 174.]

2. SAME—GROUNDS OF JURISDICTION—MISTAKE OF FACT.

Complainant entered into a contract with the receiver for a railroad company through the manager to supply coal for the use of the company at stated prices for one year, with the option to complainant to renew the contract for two years more. Within a few months the railroad was sold to defendant, which continued its operation under the same manager without visible change, and during the remainder of the year, although, owing to widespread strikes, coal had largely advanced in price, complainant continued to deliver coal, which was received and settled for by defendant at the contract price; the parties acting under a mutual mistake of fact in supposing that such deliveries were made under the contract. At the end of the year complainant elected to extend the contract for two years, but defendant refused. *Held*, that complainant was entitled to relief in equity on the ground of mistake, to have the settlements set aside, and to recover the difference between the contract price and the market price of the coal so delivered and received through mistake.

In Equity. On final hearing.

Smythe, Lee & Frost, for complainant.

J. W. Barnwell, for defendant.

PRITCHARD, Circuit Judge. On the 28th day of July, 1893, the South Carolina Railway Company, the company which owned the property afterwards held by the South Carolina & Georgia Railroad Company, and from whom the latter purchased, was in the hands of a receiver in the United States court; D. H. Chamberlain being such receiver, and C. M. Ward being general manager in practical charge of the road. On the day named, C. M. Ward, on behalf of the railroad company and the receiver, entered into a contract with the Sloss Iron & Steel Company for the purchase of the coal requirements of the railroad company for one year from August 1, 1893. This contract was for the requirement of the South Carolina Railway Company, at 85 cents for run of mines, and 92 cents for screened coal, delivered f. o. b. the mines of the company in Alabama.

The contract was regarded at that time as a very favorable one for the receiver and the railway company, inasmuch as it was considerably below the current prices for coal then prevailing. The contract contained several clauses of a special character, which will appear upon an inspection of the same. Among others was the stipulation that the bills should be paid promptly at given periods. There was a further provision for the suspension of it in case of strikes or other

unavoidable accidents. There was also a privilege to the coal company to the effect that it should have the right to renew the contract in all its terms for one or two years as it might elect.

The proceedings which were then pending terminated in a decree of the United States Circuit Court directing the property then in the hands of the receiver to be sold. This sale was effected and the property sold to the parties, who afterwards formed the South Carolina & Georgia Railroad Company. The transfer was made on or about the 12th day of May, 1894, but for some time afterwards the management of the road was continued in the hands of C. M. Ward as general manager, to whom was intrusted practically the entire management and operation of the road. The Messrs. Parsons were the purchasers, and they afterwards formed the South Carolina & Georgia Railroad Company; Charles Parsons, Sr., becoming its president, and Charles Parsons, Jr., becoming its vice president. The railroad was continued and operated as a going concern without any notice of change, so far as the public was concerned, in its actual physical management.

In May, 1894, coal was extremely scarce, owing to a strike which was then in existence. Ward, the general manager, continued to order coal under the contract, and the Sloss people continued to send it, notwithstanding the strike, and although coal was selling for very much more than the contract price. The Sloss people did not regard the strike as sufficiently affecting them to justify their taking advantage of it and, at some inconvenience to themselves, continued to supply the coal. Both parties, as a matter of fact, regarded the contract as existing, and they both acted according to it, under this mistake. About the 14th day of July, 1894, the Sloss Company notified the South Carolina & Georgia Railroad Company that it elected to take advantage of the clause of the contract, and would extend the contract in all its terms for two years from the date of its expiration, to wit, August 1, 1894. Charles Parsons, Jr., the vice president, replying to this letter, some time between July 21st and July 26th, denied the right of the coal company to elect to continue this contract for another year, and stated that, although he had been informed that the contract existed, it terminated on August 1st absolutely, and he refused to be bound by the extension and renewal. The uncontradicted testimony shows that he had been fully apprised of the contract and was acting under it.

The Sloss Company insisted that it had the right to continue the contract for two years, and, upon the positive refusal of the other side to be bound by it, they then instituted a suit in the United States Circuit Court. This suit was against the South Carolina & Georgia Railroad Company. It alleged the receiver's contract, and the further fact that the new parties were bound by it, and it asked, on the law side of the court, a judgment of a twofold character: First, for the amount of the interest due on the delayed back payments; and, second, for the damages it had suffered by reason of the refusal of the railroad company to extend the contract for two years. The Circuit Court held that the jury should render a verdict for the interest on the delayed payments, because the purchasers under the decree of court were

responsible for that, but that the purchasers were not charged further with carrying out the contract, which terminated by its own force in May, although both parties had been, by mistake of facts and law, continuing to act under it.

The suggestion was made by the court, however, that, while the receiver's contract was not of its own force binding upon the purchasers, the latter might have acted in such a way with regard to it as to have made it their own contract, or rather had made, as it were, by conduct expressed or implied, a new contract in the terms of the old contract, but that this, however, did not appear in the suit then brought. Accordingly, and acting on this suggestion, which appears in the opinion in the first suit, the Sloss Company filed a second suit on the law side of the court. This suit alleged the receiver's contract, and the facts as above referred to, but further declared that, with full knowledge of all the circumstances, the purchasers (that is, the South Carolina & Georgia Railroad Company) had so acted with regard to the contract as to practically adopt it as their own. The Circuit Court held that a nonsuit should be granted, because while both parties evidently thought and believed, as a matter of fact, that the contract was outstanding, and received and delivered coal under it, there was nothing to show an intention to make and adopt for themselves a new contract in the terms of the contract of the receiver.

This ruling of the Circuit Court was also in the record when the case went up to the Circuit Court of Appeals. In that court this judgment was affirmed, and this decision will be found in 29 C. C. A. 50, 85 Fed. 133. The Circuit Court of Appeals affirmed the ruling of the Circuit Court and held that all the parties were animated by a "mutual mistake of fact"; that the parties thought a condition of affairs existed which really did not, and they bought and sold the coal under a contract which they supposed was then existing, although it did not exist. It was also stated that the case brought by the plaintiff was a hard one, being for damages and for supposed profits which would have resulted if the contract had been renewed, and that the court was not disposed to assist the Sloss Company in a suit of that character. It was stated, however, that the suit was not on the equity side of the court for the correction of any error arising out of the supposed mistake.

The opinion of the Circuit Court of Appeals was filed February 28, 1898, and there was then brought, in June, 1898, the present and third suit. This suit was brought on the equity side of the court, and it is insisted that it is in harmony with the views entertained by the Circuit Court of Appeals in the cases to which reference has heretofore been made. It alleges the previous suits, and the fact that all the parties were acting under a mistake of facts. That, there being this mutual mistake, the coal had been delivered and had been received at very much lower prices than prevailed at the time of said delivery and receipt, and at very much lower prices than the coal company would have sold, and the railroad could have bought, during that period. That this being so, and there being an entire mistake with regard to the matter, the coal company was entitled to the difference in price which would have obtained had the coal been bought under

another contract, or at prevailing market prices. That there were some 8,000 tons of coal sold during the period, and it asked the difference between the contract price and the actual price and value of the coal at that time, together with interest upon such difference, either from the date of delivery of the coal or else from the date of the actual demand, whether before or at the time of the filing of the last suit.

It should be further added that, when the receiver turned over the property to the purchasers, a large amount of the coal delivered during the previous period was unpaid for, and, of course, much additional indebtedness arose for the coal afterwards delivered to the railroad company, and payments for this were made from time to time, extending over a period of many months (all along from the spring of 1894 to the fall of 1894); checks being sent and the coal estimated at the contract prices, under the impression that the parties were acting under the contract. The clerks who made out these bills and sent these checks had no knowledge or contemplation at any time of the condition of affairs with regard to the contract and of the proposed dispute between the two organizations. The payments were made in the ordinary course of business, and neither the checks nor the receipts specify any particular bill, but were payments from time to time, and they covered and paid in full for the entire shipments of coal as per bills and prices rendered.

This suit was brought soon after the decision of the court in the second case, as the record will show. Owing, however, to the death of his honor, Judge Simonton, and afterwards the disability of his honor, Judge Brawley, to hear the case, and to other causes, the matter has been delayed from time to time. However, the cause has been pending actively, and since the order of reference taken some time ago (without objection on either side) has been promptly conducted with due respect to the convenience of counsel on both sides in accordance with the order of reference of his honor, Judge Brawley, directing how the testimony should be taken and the case argued and heard.

Upon the foregoing statement of facts, the plaintiff insists: That in conscience and in law it should be paid the actual value of the coal at the time it was delivered to the railroad company and at prices which would have been charged had not both parties supposed they were, as a matter of fact, acting under the old contract; that, inasmuch as the courts had decided that the new parties were not bound by the contract, the Sloss Company could not get the benefit of the extension of the contract, it certainly should be entitled to the full price for its coal, which would have never been delivered and received at the lower prices had not both parties been mistaken in believing that "as a matter of fact" they were acting under the old arrangement. To accomplish this result, the complainant filed its bill in equity to set aside the settlements and prices for coal, and then after this to obtain the allowance by the court of the difference between the price at which the coal was charged and paid for and its real market value at the time. At the hearing, it was contended by the defendant that this should be a case at law, and that a court of equity had no juris-

diction. The court has carefully considered this contention and is of opinion that the same is untenable. Suits of this character are cognizable in equity, and errors such as are here set up and settlements made under such circumstances will be set aside and relief then fully granted to those who have suffered by such errors and settlements.

It is contended by the defendant: That this error could be corrected in an ordinary suit on the law side of the court; that there is a remedy at law. There must not only be a remedy at law to take the cause out of the equity court, but such remedy must be complete and adequate, and, further, this objection should be set up "on the threshold," in the language of the cases. In cases where this is not done, the court will examine the facts and retain the case if it is at all justified in doing so. Tyler v. Savage, 143 U. S. 80, 95, 97, 12 Sup. Ct. 340, 36 L. Ed. 82; Perego v. Dodge, 163 U. S. 160, 166, 16 Sup. Ct. 971, 41 L. Ed. 113; Pollock v. Farmers Co., 157 U. S. 429, 554, 15 Sup. Ct. 673, 39 L. Ed. 759; Walla Walla Co. v. Water Power Co., 172 U. S. 12, 19 Sup. Ct. 77, 43 L. Ed. 341; Boyce v. Grundy, 3 Pet. (U. S.) 210, 7 L. Ed. 655. The bill filed by complainant fully sets out the facts of mutual mistake resulting in loss to the complainant and seeks to set aside the settlements made, which settlements would necessarily be a bar to the plaintiff's recovery in the law court until so removed. It appears from the record that the defendant did not file any demurrer to the jurisdiction on this ground, but has fully answered on the merits, pleading settlement, and that it also took a joint consent order of reference to have the case tried on the equity side of the court on testimony and has joined in the taking of testimony and appeared before the court for a hearing on the merits. In view of these circumstances, it is now too late to plead at the hearing for the first time that the plaintiff's remedy is at law. The court therefore holds that it has jurisdiction and will examine into and determine the matters involved in this controversy.

The first question presented for consideration is: Were these sales of coal at the time they were made, and the prices and the settlements following them, made under mutual mistakes of fact as to those prices? There can be little doubt, from the testimony, that the purchase and delivery of coal at the lesser prices, between May 12, 1894, and July 20, 1894 (the period in question), was done through a mutual mistake of fact, both parties believing they were acting under the old contract of the receiver, and, further, that such coal would never have been sold and delivered nor thereafter so paid for had not this erroneous belief and mistake of facts existed. This view is corroborated by the testimony of the agents and officers of the defendant itself. This mutual mistake of fact thus having existed, and in consequence of which the parties were caused to act as they would not have otherwise done, the result of such mutual mistake will be corrected. The prices will be reformed, the settlements will be opened for such purpose, and a proper allowance will be made in order to do justice to the party injured by the errors. U. S. v. Barlow, 132 U. S. 271, 280, 281, 10 Sup. Ct. 77, 33 L. Ed. 346; Metcalf v. Williams, 104 U. S.

93, 96, 26 L. Ed. 665; Baltzer v. R. & A. R. R., 115 U. S. 634, 645, 6 Sup. Ct. 216, 29 L. Ed. 505; Williams v. U. S., 138 U. S. 514, 11 Sup. Ct. 457, 34 L. Ed. 1026; Tyler v. Savage, 143 U. S. 79, 12 Sup. Ct. 340, 36 L. Ed. 82.

There has been no change in the position of the defendant, and no valid reason has been stated in the pleading or argument of defendant, nor does any such appear in the record, which would cause the complainant to forfeit the right to have the old prices and settlements opened and the true values ascertained. An inspection of the record discloses no action of the complainant which would bar its equity. Indeed, it might be urged, on the other hand, that when Mr. Parsons, the vice president of the defendant company, repudiated the renewal clause of the contract about July 20, 1894, he should also have repudiated the prices of the contract and offered to settle at current prices. This he did not do. It clearly appears that this mistake and the settlement thereafter under it was mutual, and, if any one failed in conduct, Mr. Parsons and the railroad were in default, as they were receiving the benefits of the error, getting coal when it was high and almost impossible to obtain.

Nor does the strike clause interfere, because it does not appear to have been the cause; but the strike clause is not to be considered, inasmuch as the receiver's contract was no longer in force. Nor should the defendant be permitted to urge the delivery and obtain the coal during the strike period, and then claim the strike clause. This would be injustice, if not fraud. After carefully considering all the facts and circumstances, the court is of opinion that the complainant is entitled to relief.

The only question in the case, then, which seems to remain, is this: What did the plaintiff lose, and what did the defendant gain, by this mutual mistake of fact and misunderstanding with regard to these matters? Indeed, the defendant's counsel openly stated in his argument that, leaving out the jurisdictional feature, this was the only subject of inquiry remaining. In other words, the sole question now remaining is: What was the difference in the value of the coal at that time, what could the Sloss people have obtained for, say, 6,012 tons of coal, the amount in question (between May 12 and July 20, 1894), and what would the defendant have had to pay for it during the period named?

But this would seem, first, to be measured by the value of the coal at that time at the mines of the Sloss Company at Birmingham, Ala., or if coal could not have been obtained there at all, and there were no sales of coal, then the prices at Charleston, with proper allowance for freight. The testimony shows that during the period referred to above no coal was being sold at all, nor could have been bought at Birmingham, and, if on the market, it would readily have brought very high prices. Mr. Barsons, the president of the defendant company, states they had to pay "very much higher prices when they did not get coal under their contract." Mr. Ward, the defendant's general manager, who was in a position to know (as he had to make the purchases of coal), testified: That coal could scarcely be obtained at all; that he could only obtain it at Charleston from the North, and

could not obtain it elsewhere, and therefore paid for it $4.25 per ton as against the Sloss contract of $2.95, a difference of some $1.30 per ton. So, also, with the testimony of the others, which shows this very much higher price for coal prevailing until the latter part of July, when prices began again to decline. Moreover, this obtained equally as to screened coal and "run of mines," the distinction between which seems to have been practically obliterated in this time of coal scarcity.

Taking all these uncontradicted facts and the testimony into consideration, and adopting most conservative figures, the court is of opinion that the difference in price was at least 95 cents per ton, exclusive of any interest allowance, which interest the court does not see fit to give.

Accordingly, the court will open and set aside the old transactions done in evident error as they were, and will fix the amount of the allowance at $5,711.40, the product of 6,012 tons of coal at a difference of 95 cents per ton.

A decree will therefore be entered in accordance with the views herein expressed.