E. E. TAENZER & CO. v. CHICAGO, R. I. & P. R. CO.

(Circuit Court of Appeals, Sixth Circuit. April 19, 1909.)

No. 1,866.

1. RAILROADS (§ 139*)—SALES AND LEASES—CORPORATE LIABILITIES—ASSUMPTION OF PRE-EXISTING DEBTS.

An action at law is not maintainable against a successor corporation by purchase or lease to recover damages for a breach of contract by its vendor or lessor without proof of an express assumption of liability or that possession of the assets of the succeeded corporation was obtained by virtue of some relation by which liability for its prior obligations is imposed by statute.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 139.*]

2. RAILROADS (§ 139*)—SALES AND LEASES—CORPORATE LIABILITIES—ADOPTION OF CONTRACT OF PREDECESSOR.

A railroad company which succeeded to the road and property of another and continued to carry out a contract between its predecessor and a lumber company relating to shipments by the latter and the connection and operation of a private branch road owned by it, receiving the benefits thereof and demanding performance from the lumber company, thereby adopted the contract as its own and is bound by all of its provisions, and may be held liable for its own breaches thereof in a direct action at law.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 139.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**3. ACTION (§ 23\*)—NATURE AND FORM—LEGAL AND EQUITABLE.**

Estoppels in pais are called equitable merely because they arise from facts that make their application just, and not because they are peculiar to equity, and that a defendant's liability on a contract is based on such an estoppel, arising from the fact that, although it was not originally a party to such contract, it adopted the same and claimed and received its benefits, does not require the other party to resort to a court of equity to recover thereon for a breach.

[Ed. Note.—For other cases, see Action, Dec. Dig. § 23.\*]

**4. CARRIERS (§ 3\*)—WHO ARE COMMON CARRIERS—PRIVATE RAILROADS.**

A spur railway line built by a lumber company on its own land, forming a connecting line between a railroad and its mill, some miles distant, for the purpose of transporting its own products to the railroad for shipment, which had no rolling stock except an engine and logging cars and which neither did, nor held itself out to do, carrying for the public, is not a common carrier.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1, 462; Dec. Dig. § 3.\*]

**5. CARRIERS (§§ 66½, 171\*) — CONTRACT WITH SHIPPER — CONSTRUCTION AND OPERATION.**

By a contract between a railroad company and a lumber company the latter agreed to build a road from a connection with the railroad to its mill, 12 miles distant, the connection and the maintenance of a station there to be at the joint expense of the parties. It also agreed to build a side track "for the placing of cars" under the supervision of the railroad company's engineer, which should be sufficient to enable the railroad company with its engines to transfer cars "to and from its railroad and the switch and upon the railroad" of the lumber company, which also bound itself under penalties to ship all of its products, except such as should be sent by water, over the road of the railroad company. *Held*, that such contract was not one between connecting common carriers, the lumber company's road being intended and used solely for its private business, but was one between the railroad company as a carrier and the lumber company as a shipper, and by implication bound the former on reasonable notice to furnish cars on the side track in necessary numbers for the use of the lumber company in conducting its business.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. §§ 66½, 171.\*]

In Error to the Circuit Court of the United States for the Western District of Tennessee.

The plaintiff in error (plaintiff below) brought suit against the defendant (hereafter called the Rock Island Company) for the recovery of damages on account of the breaches—first, by the Choctaw, Oklahoma & Gulf Railroad Company (hereafter called the Choctaw Company); and, second, by the defendant company, in failing to deliver cars as required by a contract of November 22, 1900, between the Choctaw Company and the Gifford-Frisbee Lumber Company. The terms and conditions of this contract, and the circumstances under and the purposes for which the same was made, are these:

At the time the contract in question was made the Gifford-Frisbee Lumber Company owned a tract of about 9,000 acres of land in Cross county, Ark. (about 34 miles west of Memphis), the north line of this tract being about 12 miles north of Round Pond, which was a station on the Choctaw Road where the latter received timber products for shipment. The lumber company also owned the stumpage rights on about 3,200 acres of timber lands adjoining the tract mentioned. The tract referred to extended north and south about four miles, the south line being thus about eight miles north of Round Pond. The lumber company had a mill at Short Bend, on the St. Francis river, near the north line of its tract. The land was exclusively timber land; there was no town or city near it or accessible to it. Short Bend was simply a mill site. Nobody lived there except those connected with the lumber company's opera-

---

For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r indexes

tions. The land and the surrounding territory was bottom land, wild timber land, with no inhabitants in the neighborhood to speak of. The nearest town to the property was Parkin, Ark., about 6½ or 7 miles north of Short Bend. The next nearest place was Round Pond. The tract comprised between ninety and one hundred million feet of timber. The lumber company (which was engaged solely in the lumber business) desired facilities for marketing its logs and lumber, and the railroad company desired the transportation of, and the freight on, those timber products. In these circumstances, the railroad company and the lumber company on November 22, 1900, made a written agreement by which the railroad company agreed to give to the lumber company "a connection with its (the railroad company's) railroad at or near Round Pond, for the construction of a line of railroad by the party of the second part from said connection in a northerly direction for a distance of about 12 miles to a point on the St. Francis river," and to construct at its own cost that portion of the railroad which should be on its own right of way, and which it should own. The lumber company on its part agreed, at its own expense, to construct a road from the St. Francis river to the point where such road should intersect the north boundary line of the railroad right of way, the grading, bridging, and construction of the lumber company's road to be subject to the approval of the chief engineer of the railroad company, "the connection of the railroad of the (lumber company) with the railroad of the (railroad company) at said joint of intersection to be under the supervision of, and according to the plans prepared by, the chief engineer of the (railroad company)." The lumber company further agreed to construct "at its own cost and expense, and on its own right of way, a switch or side track near the place of intersection of said railroads, for the placing of cars," and agreed "that said switch or side track and that portion of the main line of the (lumber company) between said switch and the joint of intersection of said railroads—or such portion of said main line and side track of the (lumber company) as in the judgment of the chief engineer of the (railroad company) shall be sufficient to enable the (railroad company) with its engines to transfer cars to and from its railroad to the switch and upon the railroad of the (lumber company)—shall be laid with" rails of a certain weight, to be furnished by the railroad company at a given price. The lumber company further agreed that, after the line of its road should be surveyed and located, maps of the same, showing its connection with the railway company's road, should be made. The railroad company in turn agreed to furnish to the lumber company the frogs, switches, spikes, and bolts at cost, to be paid for by the lumber company in cash when delivered. It also agreed to sell to the lumber company the necessary rails and fastenings for the construction of the road at agreed prices per ton, payment of the purchase price of such rails and fastenings to be secured by a mortgage payable six years from the date of the contract, the latter providing for application upon this purchase price of a given part of the proportion of through freights due the lumber company under an arrangement for such division hereafter referred to.

It was further agreed that passenger and freight depot buildings and platforms should be erected at the joint expense of the railroad company and the lumber company, at the point of connection of the lumber company's road with the railway company's road, each party to stand one-half the cost of maintenance of the buildings and platform, station agents, etc. The lumber company then bound itself to ship over the railroad company's lines, during a period of 10 years, all of its lumber and the traffic originating on the lumber company's road, except such as the latter might desire to ship to and from Memphis by way of the St. Francis and Mississippi rivers. The contract provided (in case of the breach of such agreement) for an immediate maturity of the lumber company's indebtedness for rails and fastenings, with the right in the railroad company to take immediate possession thereof, and that, in case of the shipment of lumber by the lumber company over any other line of railroad, the lumber company should pay to the railroad company a certain freight rate as stipulated damages. A memorandum of through rates from and to points on the lumber company's road for a period of 10 years was attached to the contract, and provided for rates on lumber from mills on the lumber company's line to Hopefield and Memphis, on cotton to those places, on merchandise to and from Memphis, and on grain and grain prod-

ucts from stations on the railroad company's line to points on the lumber company's road.    September 23, 1902, E. E. Taenzer, then a manufacturer and wholesale dealer in lumber, doing business as E. E. Taenzer & Co., succeeded by assignment to the rights of the Gifford-Frisbee Lumber Company in the contract referred to; and thereupon the Choctaw Railroad Company, in writing, assented to, ratified, and confirmed the assignment, Taenzer assuming by the written agreement all of the liabilities and obligations of the contract and freight rate agreement, and agreeing to fully perform them. The plaintiff was incorporated as the successor of Taenzer in the lumber business, and succeeded to all the latter's rights.    The lumber company's road, neither during plaintiff's ownership nor in that of its predecessors, had any rolling stock except some logging cars used for furnishing logs to the mill at Short Bend, over the lumber company's road referred to, together with an engine used for hauling these logging cars and hauling the railroad company's freight cars between the connection at Round Pond and the plaintiff's mill at Short Bend.    The railroad was never incorporated until after the commencement of this suit, but was a part of the lumber company's property, and used entirely in the business of the lumber company as a mere means of getting its output to the railroad company's tracks.    It touched no town or property except the lumber company's timber lands.    It never hauled any cotton, and there was no cotton in that part of the country for it to haul.    It was never advertised as a common carrier for the purpose of obtaining shipments of any commodity.    Upon the trial in the Circuit Court proof was given or offered that the Choctaw Company continued to operate the railroad and to carry out the contract in part until the early part of 1901, at which time the defendant road in some way "took over" the Choctaw Road; that after such taking over no change was made in the method of conducting the business between the railroad company and the lumber company; the same local railroad officers were continued in authority; the same literature and letter heads were used; the Rock Island Company proceeded with the execution of the contract and claimed the benefit of it, demanding of the plaintiff the execution by it of the contract in so far as it required payment of the indebtedness to the Choctaw Road as created by the contract—all these acts being done in the corporate name of the Rock Island Company, as on its own behalf; that the plaintiff had no knowledge of any change in the corporate entity; that among the acts of the Rock Island Company asserting such rights of ownership is a letter from defendant to plaintiff, dated March 12, 1906, demanding freight due under the contract, and saying, "Our contract indicates that one-half the total expense of the station shall be borne by your company"; also a letter from defendant's general superintendent to its local superintendent at Little Rock, dated May 26, 1906, saying: "I wish you would get contract between this company and the St. Francis River Railroad and E. E. Taenzer & Company, go over it carefully and then issue such instructions to your agent at Round Pond as will make him understand he is a joint agent representing equally the St. Francis River Railroad and the Rock Island Railway"; also letter of November 6, 1906, by the defendant's general auditor to E. E. Taenzer, as president of the St. Francis River Railroad, referring to "statement of balance due this company as of June 30, 1906, under contract of November 22, 1900, between Clifford (evidently meaning Gifford) and the Choctaw, Oklahoma & Gulf Railroad."

There was, however, neither proof nor offer of proof as to the terms and conditions under which the defendant took over the property of the Choctaw Company, whether by lease, through consolidation, or sale, nor any proof that defendant ever expressly assumed liability for breaches of the contract on the part of the Choctaw Company.    Plaintiff introduced evidence that throughout the execution of the contract, both by the Choctaw Company and defendant, it was the regular practice of the railroad company to place the cars furnished for the lumber company upon the latter's tracks for the purpose of being hauled by the lumber company's engine to the latter's mill and to points on the line of the lumber company's road, and there loaded with lumber or logs and hauled back and delivered to the railroad company at the point of connection referred to.    Plaintiff further introduced evidence that at numerous times during the operation, both by the Choctaw Company and the

defendant, its demands for cars necessary for hauling out its lumber or logs for shipment had not been complied with, and tending to show that such failures to so comply were unnecessary and unreasonable, and that plaintiff suffered large damages through such failure to so furnish cars.

The defendant introduced no testimony. The court (having previously held that there was no evidence showing a liability on the part of defendant for the defaults of the Choctaw Company) at the close of plaintiff's case directed a verdict for the defendant, upon the grounds that the so-called St. Francis River Railroad was shown to be a common carrier; that in the absence of special contract the defendant could, as a common carrier, owe no duty to the St. Francis River Railroad to supply the latter with rolling stock for the purpose of hauling freight over its own lines; that the written contract of November 22, 1900, between the Choctaw Company and the Gifford-Frisbee Lumber Company, did not require the railroad company to so furnish cars to the lumber company; that the defendant's only duty was to receive for transportation logs and lumber delivered at Round Pond, on the right of way of the defendant company; and that there was no proof of a refusal or failure by the defendant company to receive logs or lumber delivered upon its right of way.

Caruthers Ewing, for plaintiff in error.

E. E. Wright, for defendant in error.

Before LURTON and SEVERENS, Circuit Judges, and KNAPPEN, District Judge.

KNAPPEN, District Judge, after stating the facts as above, delivered the opinion of the court.

1. The trial court rightly held that there was no testimony tending to show the defendant liable for breaches of the contract on the part of the Choctaw Company. As appears by the statement of facts above, no testimony whatever was introduced tending to show by what means (whether consolidation, lease, or otherwise) the defendant acquired its interest in the contract or in the property generally of the Choctaw Company; much less was there any evidence that the defendant, by virtue of either statutory obligation or express agreement, undertook to become liable for the prior defaults of the Choctaw Company. Plaintiff's counsel frankly says in his brief that:

"On this record it is impossible to tell whether the defendant represents the result of a consolidation of the Choctaw and some other road; it is impossible to tell whether the defendant is a purchaser of the Choctaw Road or a lessee thereof."

Plaintiff's right to recovery is rested upon the proposition that "the fact of assumption of the liabilities of the contract is conclusively presumed from the defendant's admission that it received the benefit of the contract." No cases are cited, and we know of none, which support the proposition that a suit is maintainable at law against a successor corporation, through lease or purchase, for recovery of damages on account of a prior default of the original contracting corporation, without proof either of an express assumption of liability by the successor corporation, or that the possession of the assets of such corporation was obtained by virtue of some relation by which liability for the prior obligations of such corporation is imposed by statute. On the contrary, the authorities are express that neither a lessee nor a purchaser becomes liable for the prior debts or obligations of the lessor or vendor, in the absence of either express contract or statutory provision therefor.

1 Elliott on Railroads, §§ 459, 462; Hoard v. Chesapeake & Ohio R. R. Co., 123 U. S. 222, 226, 8 Sup. Ct. 74, 31 L. Ed. 130; Wiggins Ferry Co. v. O. & M. Ry. Co., 142 U. S. 396, 407, 408, 12 Sup. Ct. 188, 35 L. Ed. 1055; 4 Cook on Corporations, § 895; Rice v. Norfolk & Western Ry. Co., 153 Fed. 497, 82 C. C. A. 447.

2. The question next arises whether the testimony presented tended to show the defendant liable for breaches of the contract by it after its succession to the rights of the Choctaw Company. The testimony tended to show an actual acquirement by the defendant of the rights of the Choctaw Company under the contract of November 22, 1900, an express assertion of its rights under the contract as against plaintiff, the proceeding to carry out the contract under such claim of right so to do, demands upon the plaintiff that it perform its reciprocal obligations, and the receipt from the plaintiff of the benefits of the contract by virtue of such claim of right thereto.

In Wiggins Ferry Company v. Ohio & Miss. Ry. Co., 142 U. S., at page 408, 12 Sup. Ct., at page 192 (35 L. Ed. 1055), it is said:

"It is not necessary that a party should deliberately agree to be bound by the terms of a contract to which he is a stranger, if having knowledge of such contract he deliberately enters into relations with one of the parties which are only consistent with the adoption of such contract. If a person conduct himself in such manner as to lead the other party to believe that he has made the contract his own, and his acts are only explicable upon that theory, he will not be permitted afterwards to repudiate any of its obligations."

In the case cited, the ferry company, which operated a ferry across a navigable river and owned the land at the landing and about the approaches, contracted with a railroad company for the use of the land for the purposes of its business so long as they should be used and employed for such uses and purposes. In consideration thereof the railroad company agreed, among other things, always to employ the ferry company in its transportation across the river. After the railroad company had for several years performed its contract, its property was purchased by the defendant company, no formal assignment of the interest of the railroad company in the contract mentioned having been made. The defendant entered into possession of the land leased to the railroad company, and for several years continued to carry on the business as it had been carried on before, but without making any new contract or any agreement for rent. The defendant later diverted a portion of its transportation across the river to other carriers. The proceeding was brought to recover damages for such diversion. It was held that by reason of this course of dealing the defendant "and the ferry company sustained the same relation as had previously existed under the deed between the railroad company and the ferry company, or at least that both parties are equitably estopped from denying that such was the case." This conclusion was rested upon the ground that the defendant had by its conduct adopted the contract between its predecessor and the ferry company and made that contract its own.

In Chicago & Alton R. R. Co. v. Chicago, Vermillion & Wilmington Coal Co., 79 Ill. 121, which is cited with approval in the Wiggins Ferry Case, 142 U. S. 409, 12 Sup. Ct. 188, 35 L. Ed. 1055, certain individuals interested in the coal company constructed a coal railroad

from Streator to Winona, on the Illinois Central Railroad, and later sold this coal road to the Jacksonville Railroad Company, by the terms of which sale it was agreed that all coal carried from the coal company's mines at Streator to Winona, for the use of that town and its vicinity, or for delivery to the Illinois Central Railroad Company for the use of that company, or for further transportation on its line of railroad, should be carried over the coal road in question at a certain price per car. The Jacksonville Company at once turned over the coal road to the appellant company. There was no covenant in the deed of transfer that appellant should perform the obligations assum-. ed by the Jacksonville Company to the coal company, but for more than three years appellant did carry the coal company's coal from Streator to Winona, over the road in question, at the price stipulated in the contract between the coal company and the Jacksonville Company. It was held that "appellants placed their own construction upon this contract and of their obligations under it by carrying coal for three years. By doing this they expressly assumed the contract of the Jacksonville Company, * * * and they must be held estopped by their own act and conduct." These cases establish the proposition that the defendant may be held, under the testimony presented, to have adopted the contract of the Choctaw Company, and to be liable for its own breaches thereof.

3. The question next presents itself whether plaintiff's remedy is at law, or whether it must be sought in equity. The proceeding in the Wiggins Ferry Case for the recovery of damages was in equity in this respect: that the relief was sought under an intervening petition filed in a pending foreclosure suit in equity. And it is true that in that case the court said (without other discussion of form of remedy) that the railway company "must be held in a court of equity to have adopted such contract and made it its own." In that case it was necessary to the liability of the railway company that it should have acquired by virtue of its relations with the ferry company the rights held by the originally contracting railroad company. The defendant held no deed of the premises affected. The remark above quoted seems to refer to this situation, in connection with the conclusion that "the railway company acquired an equitable estate in the premises of like character as the legal estate previously held by the railroad company." The decision contains not even an implication that a resort to equity would be necessary unless in a case where the acts of adoption were insufficient for the acquisition of legal rights. In the instant case no deed or instrument in writing was necessary to the adoption by the railroad company of its predecessor's contract. The original contract was not under seal. Under the view we have taken of the liability of the defendant, no question of answering for the default of another is involved. It is only for its own default that the liability of the defendant is under consideration. The provision of the statute of frauds requiring contracts for more than one year to be in writing is not contravened as to actions for breaches occurring during the period covered by the actual carrying out of the contract. If, as asserted in the Ferry Case, a party is to be held to have adopted, and to be bound by, the terms of a contract to which he is a stranger, when with knowledge of such con-

tract he deliberately enters into relations with one of the parties which are consistent only with the adoption of such contract, no reason is apparent why the remedy should be confined to equity, unless the right asserted is merely equitable. In the case here presented the defendant's obligation was not predicated upon mere acquiescence but upon an affirmative, express adoption of the contract and assertion of rights under it. The fact (if it be so regarded) that the liability is made to depend upon the principle of equitable estoppel does not limit the relief to equity; for it is well settled that estoppels in pais are called equitable merely because they arise from facts that make their application just, and not because they are in any way limited to cases in equity. They are fully as applicable in courts of common law. Barnard v. German-American Seminary, 49 Mich. 444, 13 N. W. 811; Dickerson v. Colgrove, 100 U. S. 578, 582, 25 L. Ed. 618; Drexel v. Berney, 122 U. S. 241, 253, 7 Sup. Ct. 1200, 30 L. Ed. 1219; Anglo-American Land, etc., Co. v. Lombard, 132 Fed. 721, 733, 68 C. C. A. 89.

It is true that in some jurisdictions the beneficiary of a promise made to a third person can sue for its enforcement only in equity, although it is the prevailing rule in this country that such beneficiary may maintain assumpsit on a promise not under seal (Hendrick v. Lindsay, 93 U. S. 143, 149, 23 L. Ed. 855), the question of remedy depending in the federal courts upon the law of the forum in which the case is tried (Willard v. Wood, 135 U. S. 309, 312, 313, 10 Sup. Ct. 831, 34 L. Ed. 210). But in the jurisdictions in which the right to sue at law is denied, such denial is based upon the lack of privity between the promisor and the beneficiary of the promise. There is to our minds no analogy between an action of that nature and that under consideration here; for here the defendant, as successor in interest of the Choctaw Company, by direct relations with the successor in interest of the lumber company, is claimed to have adopted the contract as its own. A mutuality of contract would thus be created, and by such dealings the parties regarded as having made a new contract between themselves, on the same terms as those of the contract between the original parties, so long at least as such relations continue. It is worthy of note that in the case of Railroad Co. v. Coal Co., 79 Ill. 121, which, as before stated, was cited with approval in the Wiggins Ferry Case, the action was at law. In the case of Florida Central & Pen. R. R. Co. v. Bucki, 68 Fed. 864, 16 C. C. A. 42, which was an action at law for damages for breach of a contract as to freight charges made by the predecessor of the defendant, based upon the proposition that the defendant had by its acts adopted, ratified, and confirmed the contract, the Court of Appeals of the Fifth Circuit seems to have considered that a cause of action existed at law, provided the adoption of the contract was sustained by proofs.

. We have not overlooked the fact that in the case of Sloss Iron & Steel Co. v. So. Car. & Georgia R. R. Co., 85 Fed. 133, 29 C. C. A. 50, the Court of Appeals of the Fourth Circuit seems to have construed the decision in the Wiggins Ferry Case as based upon purely equitable principles. The Sloss Case likewise involved elements making a resort to equity necessary, on the ground of mistake, and we find nothing in that case in conflict with the conclusion we have reached as to

the remedy in the instant case. The conclusion reached is that, under the facts presented here, plaintiff's remedy is not confined to equity.

4. In our opinion, the court erred in holding that the St. Francis River Railroad was a common carrier, and in interpreting the contract as imposing no obligation upon the railroad company save that owing at the common law from one common carrier to another. The chief arguments adduced in favor of the proposition that the so-called St. Francis River Railroad is a common carrier are that the term "railroad," as contained in the name under which the road was operated, imports the status of common carrier; that the provisions in the contract for joint construction and maintenance of passenger and freight depot buildings and platforms (including joint station agent), the reference therein to the lumber company's line as a "railroad" and to its "right of way," the provision for division of freight rates as between two connecting carriers, and the including in the agreement for rates and division thereof shipments of cotton and of merchandise, are consistent only with the status of the St. Francis River Railroad as a common carrier. But these considerations cannot outweigh the substantial considerations shown not only by the contract, but by the conditions and circumstances under which it is shown to have been made. They cannot overcome the fact, which clearly stands out, according to the proofs given or offered, that the so-called railroad was intended, both by the railroad company and the lumber company, merely as a spur to the mill for the purpose of enabling the lumber company, not as a carrier, but as a shipper, to transport its forest products over the line of the Choctaw Road; that, throughout, the lumber company's relation to the railroad company was in fact that of a shipper—a relation emphasized by the requirement that the lumber company ship "its products over the Choctaw Railroad unless transported by river." The terms used and the provisions relied upon as establishing the status of common carrier cannot prevail against the considerations that this lumber and logging road had no rolling stock suitable for any purpose except logging; that there was in the neighborhood no cotton or other merchandise to ship, and no inhabitants to serve as carrier, either in the relation of passengers, shippers, or consignees; and that there was no holding out of the road as such carrier by advertisement or otherwise. No rule for the interpretation of contracts is better settled than that in construing a contract the court should place itself so far as possible in the situation of the parties when the agreement was made. Construing this contract in the light of the situation shown by the evidence admitted or offered, we have no difficulty in holding that the St. Francis River Railroad was not a common carrier, but was a mere spur extending through the timber and to the mill of the plaintiff as a mere adjunct to its lumber business. In Moore on Carriers, at page 20, it is said:

"According to all the authorities, the essential characteristics of the common carrier are that he holds himself out as such to the world; that he undertakes generally, and for all persons indifferently, to carry goods, and deliver them, for hire; and that his public profession of his employment be such that if he refuse, without some just ground, to carry goods for any one, in the course of his employment and for a reasonable and customary price, he will be liable to an action."

A private railroad, established as an incident to a private business, is not a common carrier. McKivergan v. Lumber Co., 124 Wis. 60, 102 N. W. 332; Moore on Carriers, p. 72, § 35. See, also, Wade v. Lutcher & M. Cypress Lumber Co., 74 Fed. 517, 20 C. C. A. 515, 33 L. R. A. 255; Eastern & Western Lumber Co. v. Rayley, 157 Fed. 532, 535, 85 C. C. A. 296.

But independently of the status of the St. Francis River Railroad as a common carrier, the trial court was in error in holding that there was nothing in the written contract of November 22, 1900, which obligated the railroad company to furnish cars for logs or forest products to be delivered elsewhere than directly upon the railroad company's right of way. The provisions in the contract, first, requiring that the connection of the lumber company's road with that of the railway company at the "joint of intersection shall be under the supervision of and according to plans prepared by the railroad's chief engineer; second, by which the lumber company agreed to construct a switch or side track near the place of intersection of the roads "for the placing of cars"; third, the stipulation for the laying with a certain weight of steel rails that portion of the lumber company's "main line" between the switch and the "joint of intersection," or such portion of the "main line" and side track of the lumber company as in the judgment of the chief engineer of the railway company shall be sufficient to enable the (railway company), with its engines, to transfer cars to and from its railroad to the switch and upon the railroad of the lumber company; and, fourth, the requirement that the lumber company, under drastic penalties for failure to do so, must ship all its products over the railroad company's line—in connection with the other provisions of the contract referred to in the statement of facts preceding this opinion, construed in the light of the circumstances under which the contract was made, necessarily affirm the existence of relations beyond those arising between common carriers in the absence of contract, and necessarily show that it was contemplated by the parties that the railroad company should place its cars upon the lumber company's switch provided for the placing of cars, and should in turn haul them therefrom over the "joint of intersection" to and upon the railroad company's tracks, and necessarily imply an agreement on the part of the railroad company that cars in necessary numbers and upon reasonable notice should be placed by the railroad company upon the spur track for the use of its patron in connection with the logging and lumbering plants constructed and to be constructed along the line of the spur.

The testimony as to the custom of the railway company to make such deliveries of cars upon the lumber company's tracks, for the purposes stated, does not violate the rule which forbids altering the terms of an unambiguous contract by proof of custom. Such testimony was admissible for the purpose of showing the actual adoption by the defendant of the contract made by its predecessor, and in connection with that adoption the practical construction placed by the defendant upon the contract which it was adopting. The contract as construed by us is not subject to the objection of lack of mutuality, for the lumber company was under stringent obligations to ship its products over the line of the railroad company.

5. But the obligation imposed by the contract upon the railroad company was not to furnish cars whenever and in whatever quantities demanded. There is no provision for the furnishing of any specified number of cars, or at any specified times; much less an agreement that plaintiff should be the sole judge of the reasonableness of its own demands. The obligation imposed was, however, to furnish cars in necessary numbers and upon reasonable notice. A liability for failure to furnish cars must thus depend upon proof of special and reasonable requests by the plaintiff, having in mind the reasonable demands and the proper conducting of defendant's business, followed by an unreasonable refusal or failure on the part of defendant to comply with such special and reasonable requests. What cars were necessary and what notice was reasonable, and whether defendant's failures to furnish were unreasonable, were questions of fact in the case of each alleged demand. Evidence was introduced or offered tending to show in certain instances such special and reasonable demands by the plaintiff, and in some instances unreasonable failures by defendant to comply therewith. There thus existed questions of fact for the jury, to whom the case should have been submitted.

We find no occasion upon this record to discuss the various questions presented by counsel as to the sufficiency of the proofs as to the reasonableness of plaintiff's demands or the unreasonableness of defendant's failures to comply therewith, nor to pass upon questions of damages resulting from such failures. None of these questions have been passed upon by the court below, and they may never arise upon a trial had under the views we have expressed.

The judgment of the Circuit Court must be reversed, and a new trial ordered.