*EZZARD v. STATE NAT. BANK.

No. 6018.   Opinion Filed April 18, 1916.

(157 Pac. 127.)

1.   **CORPORATIONS—Powers and Liabilities—Effect of Sale.**   A purchasing corporation does not become liable for the prior debts or obligations of the vendor corporation, in the absence of either express contract or statutory provisions therefor.   The defendant bank herein assumed none of the liabilities of the Oklahoma City National Bank except deposit liabilities, and no other

* Appealed to the Supreme Court of the United States.

liability of the constituent corporation has been imposed upon it by law.

2. **BANKS AND BANKING—Sale of Assets—Actions—Evidence.** No part of the claim of plaintiff sued on in this action was deposit liability of the Oklahoma City National Bank.

3. **CORPORATIONS—Powers and Liabilities—Effect of Sale.** The liability of the purchasing corporation is very similar to the liability of an individual who purchases the assets of a debtor, and it does not, by reason of the purchase merely, become liable for the debts of the selling corporation.

4. **SAME.** It is a general rule that in order to render the purchasing company personally liable for the debts of the selling corporation, it must appear that: (a) There be an agreement to assume such debts; (b) the circumstances surrounding the transaction must warrant a finding that there was a consolidation of the two corporations; (c) that the purchasing corporation was a mere continuation of the selling corporation; or (d) that the transaction was fraudulent in fact. No fraud was pleaded or proven in this cause.

(Syllabus by Davis, C.)

*Error from District Court, Oklahoma County;*
*Geo. W. Clark, Judge.*

Action by Mollie Ezzard against the State National Bank. Judgment for defendant, and plaintiff brings error. Affirmed.

*H. R. Winn* and *Asp, Snyder, Owen & Lybrand,* for plaintiff in error.

*Wilson & Tomerlin* and *E. E. Buckholts,* for defendant in error.

Opinion by DAVIS, C. This was an action begun in the district court of Oklahoma county on the 20th day of December, A. D. 1912, by the plaintiff below, and for convenience the terms plaintiff and defendant will be employed by the court throughout this opinion.

The plaintiff in her amended petition alleges in substance:

That the defendant is a national bank doing business in Oklahoma City. That the Oklahoma City National Bank was for a number of years prior to May, 1911, a national bank doing business in Oklahoma City. That on the ———— day of May, 1911, the Oklahoma City National Bank consolidated with the defendant State National Bank under the laws of the United States, the latter bank assuming all the liabilities of the Oklahoma City National Bank, both by law and by contract. That on the 28th day of March, 1911, one I. M. Holcomb being indebted to the Oklahoma City National Bank in a sum exceeding $2,000 evidenced by his promissory notes partially secured by Military Park Development Company bonds, and the said indebtedness being then and there due and the said Holcomb insolvent and the Military Park Development Company bonds, deposited as collateral security for said Holcomb's notes, being wholly inadequate as security and practically worthless, all of which facts were known to said Oklahoma City National Bank, the officers and business managers of said bank, for the purpose of procuring $2,000 to apply upon the indebtedness of said Holcomb and for the purpose of causing the plaintiff to loan that amount to Holcomb, detached and delivered to Holcomb four of said Military Park Development Company bonds of the aggregate face value of $2,000, together with a writing directed to this plaintiff recommending a contemplated loan to said Holcomb of $2,000 as good, and agreeing to pay the same at maturity if Holcomb failed. Said letter was in words and figures as follows, to wit:

"H. W. Williams, President.
"A. M. Young, Vice President.
"C. H. Everest, Vice President.
"Don Lacey, Vice President and Cashier.

"W. M. Bonner, Asst. Cashier.
"Frank L. Clark, Asst. Cashier.

"Capital $500,000. United States Depository.
"The Oklahoma City National Bank.

"March 28, 1911.

"Miss Mollie Ezzard, City: If you desire to loan Mr. I. M. Holcomb two thousand dollars for one year, secured by an equal amount of Putnam bonds, which he is bringing you, we would recommend it as a good loan and would agree to take the loan up at its expiration if he does not.                        Yours truly,

"[Signed]                   C. H. EVEREST,
"CHE-MC.                     Vice President."

That the plaintiff, a widow, because of her faith in the representations and guaranty of the said Oklahoma City National Bank, loaned the said I. M. Holcomb $2,000, taking his promissory note therefor, the said note bearing 10 per cent. interest from date until paid and due in one year, and providing for 10 per cent. as attorney's fee for the collection thereof if placed in the hands of attorneys for collection, to which note the said Military Park Development Company bonds were attached as collateral by the said Holcomb. The said note was in words and figures as follows, to wit:

"$2000.00                           March 28, 1911.

"One year after date, for value received, I, we, or either of us jointly and severally, waiving grace and protest, promise to pay to the order of Mary Ezzard at Oklahoma City National Bank, two thousand 00/00 dollars, with interest from date at the rate of ten per cent. per annum, payable annually until paid. The interest if not paid annually to become as principal and bear the same rate of interest, and in case this note is placed in the

hands of an attorney for collection I agree to pay ten per cent. additional for the collection of the same. The indorsers, guarantors and assignors severally waive presentment for payment, protest and notice of protest thereof for nonpayment of this note, and consent that time of payment of this note may be extended without notice.

"I. M. HOLCOMB."

That the letter of guaranty and the Military Park Development Company bonds were given to said Holcomb by said bank pursuant to an agreement that in case said Holcomb should procure the loan from the plaintiff, Holcomb would pay the said sum so obtained to said bank to apply upon his indebtedness to said bank, and that the said Holcomb, pursuant to said agreement, did turn over the sum of $2,000 so obtained from the plaintiff to said bank; that when the note became due, demand was made, and upon the failure of said Holcomb to pay the same, plaintiff advertised and sold said collateral, for which she received the sum of $5 and which she duly credited upon said note and thereafter entered suit against said Holcomb, and got judgment against him, but because of his insolvency plaintiff was unable to collect anything on said note.

Thereafter the plaintiff made demand upon the State National Bank, with which, prior to the maturity of the note, the Oklahoma City National Bank had consolidated, and with said demand the defendant refused to comply; that by virtue of these facts the State National Bank was liable and bound in law and equity to this plaintiff to pay the said $2,000 so received by Oklahoma City National Bank and the defendant State National Bank by virtue of said consolidation, together with interest thereon at the rate of 10 per cent. per annum from the 28th day of

March, 1911, until paid, and 10 per cent. additional as attorney fees for the collection thereof, and that by the refusal to pay the same the defendant had damaged this plaintiff in said amount. And in the alternative, said petition stated that if said defendant State National Bank was not bound to the plaintiff by virtue of the foregoing facts, according to the strict letter of said note for principal, 10 per cent. interest and 10 per cent. attorney's fee, nevertheless in any event it was liable and bound in law and equity to the plaintiff for the sum of $2,000 so received by said Oklahoma City National Bank and the defendant, together with interest thereon at 6 per cent. per annum from the 28th day of March, 1911, until paid, and that plaintiff had made demand for the payment of said amount, and that the failure of defendant to comply with said demand had damaged the plaintiff in said amount.

Said petition concluded with the prayer for judgment for the sum of $2,000, 10 per cent. interest from March 28, 1911, until paid, and 10 per cent. attorney fees; and, further, that in event the plaintiff be not entitled to the full sum so paid, she have and recover the full sum of $2,000, with interest thereon at the rate of 6 per cent. per annum from the 28th day of March, 1911.

The defendant in its amended answer, after making a general denial and an admission of corporate existence, alleged that:

"Third. Defendant further denies that it received any of the proceeds of the alleged loan made by the plaintiff to one I. M. Holcomb, which said loan, plaintiff alleges, she was induced to make by reason of the written guaranty signed by one C. H. Everest, vice president of the Oklahoma City National Bank.

"Fourth. Defendant further specifically denies that the said letter alleged to have been written by the said C. H. Everest as vice president of the Oklahoma City National Bank to the plaintiff in the above action, which induced said plaintiff to make said loan, was the official communication of the said Oklahoma City National Bank, all of which was well known to the plaintiff. Defendant alleges that if the said letter was written and signed by the said C. H. Everest, as alleged in plaintiff's petition, the said Everest had no authority to bind the bank, either in law or in fact, all of which was well known to the plaintiff. Defendant states that if said letter was in fact written and signed by the said Everest, purporting to act for said bank, it was not the act of the bank, but the individual act of said Everest, for the reason that the said bank could not enter into such a contract and that the same is *ultra vires* and therefore void and of no force and effect.

"Fifth. Defendant states that the said letter set out in plaintiff's petition written by the said C. H. Everest to the said plaintiff, Mollie Ezzard, was merely a proposition and if accepted was never communicated to either the said C. H. Everest, the Oklahoma City National Bank, or any person acting for it, and said Oklahoma City National Bank, C. H. Everest, and this defendant did not know of the acceptance of said proposition, if the same was in fact at all accepted by the said plaintiff, and that the minds of the parties to said transaction never met in relation thereto, and said plaintiff made no contract with said Oklahoma City National Bank, C. H. Everest, or any one acting for the said Oklahoma City National Bank. Defendant denies that said letter of communication states or is in any manner a contract of guaranty on the part of the said Oklahoma City National Bank.

"Defendant further denies that there was any contract made or entered into by and between the Oklahoma City National Bank and this defendant whereby said defendant agreed and contracted to pay all the obligations of the said Oklahoma City National Bank."

The evidence shows the resolution of the Oklahoma City National Bank as adopted by it to be as follows:

"Resolved, that the president of the State National Bank of Oklahoma City, Okla., be and he is hereby authorized and empowered to purchase from the Oklahoma City National Bank of Oklahoma City, Okla., the assets of the Oklahoma City National Bank and assume the payment of the deposit liabilities of said Oklahoma City National Bank. The difference between the said liabilities assumed and the assets taken over shall be placed to the credit of D. Lacy, liquidating agent of the Oklahoma City National Bank.

"Resolved, that in making the above-mentioned purchase the president of the said State National Bank shall not purchase any assets of the Oklahoma City National Bank that a national bank is prohibited by law from acquiring, or the assets set forth in schedules 'A' and 'C' the letter of the National Bank Examiner given us this day.

"Resolved, that the president of the State National Bank aforesaid, for and on behalf of said State National Bank, shall assume the deposit liabilities of the Oklahoma City National Bank, but shall not assume any liabilities of the said Oklahoma City National Bank that may be prohibited by the National Banking Act."

And the record discloses the resolution adopted by the State National Bank to be as follows:

"Resolved, that the president of the State National Bank of Oklahoma City, Okla., be and he is hereby authorized and empowered to purchase from the Oklahoma City National Bank of Oklahoma City, Okla., the assets of the Oklahoma City National Bank, and assume the payment of the deposit liabilities of the said Oklahoma City National Bank. The difference between the liabilities assumed and the assets taken over shall be placed to the

credit of D. Lacy, liquidating agent of the Oklahoma City National Bank.

"Resolved, that in making the above-mentioned purchase the president of the said State National Bank shall not purchase any assets of the Oklahoma City National Bank that a national bank is prohibited by law from acquiring of the assets set forth in schedules 'A' and 'C' of the letter of the national bank examiner given us this day.

"Resolved, that the president of the State National Bank aforesaid for and on behalf of the said State National Bank shall not assume the deposit liabilities of the Oklahoma City National Bank that may be prohibited by the National Banking Act."

From the testimony of the witness H. W. Williams, introduced by the plaintiff in error, who, after testifying that he was president of the Oklahoma City National Bank at the time the State National Bank purchased some of its assets, and afterwards became president of the State National Bank, we quote as follows:

"Q. Now, Mr. Williams, do you know what became of the assets of the Oklahoma City National Bank? A. Why, a portion of them were taken over by the State National Bank, and the others were turned over to Mr. Don Lacy, as liquidating agent. Q. You say some of them went to Don Lacy, as liquidating agent? A. Yes, sir. Q. Now, just explain to the jury what you mean by that, Mr. Williams? A. Well, the State National Bank took over such as they were permitted to take over under the law, and those that were not permitted to be taken over were transferred to Don Lacy, as liquidating agent for the Oklahoma City National Bank. Q. By 'liquidating agent' you mean he was to get the money on them as he could? A. Yes, sir. Q. Now, then, these were assets that had been charged off, were they, of the Oklahoma City National Bank? A. Well, some of them had been charged

off; in other words, everything that belonged to the Oklahoma City National Bank went into Lacy's hands as liquidating agent, including the old paper or anything relating to real estate; another item was the fixtures. Q. Now, then, that salvage, if I may use that term, Mr. Lacy was to collect and turn into money as he could? A. Yes, sir. Q. And as rapidly as he could? A. Yes, sir. Q. And to do what with the money? A. To take care of whatever obligations that the Oklahoma City National Bank might have unpaid, and the remainder was supposed to belong to the stockholders of the Oklahoma City National Bank. Q. Mr. Williams, do you know what amount of assets was transferred from the Oklahoma City National Bank to the State National Bank, at the time that the banks consolidated? A. No, sir; I don't remember the amount. Q. Can you approximate about the amount? A. Oh, possibly a million and a half. Q. Mr. Williams, state what other property belonging to the City National Bank, if any, that you turned over to the State National Bank at the time of the consolidation. By the Court: Other than what? Q. Other than the million and a half that you speak of? A. Well, the procedure was merely this: So far as the dealings between the State National Bank and the Oklahoma City National Bank, at the time of the consolidation, the State National Bank merely took over the deposits of the Oklahoma City National, and the Oklahoma City National paid them in cash and other assets enough to take that up. Mr. Lacy was the liquidating agent of the Oklahoma City National Bank and took over the residue. Now, at various times he sold to the State National Bank some of those assets. I think some of them he sold to St. Louis, but at that time—the time of the consolidation—that was all that went in. Q. Now, how much cash, if any, belonging to the Oklahoma City National Bank was turned over to the State National at that time? A. Well, none of the Oklahoma City National's assets were turned over to the State National, only the deposits. Q. Only the deposits? A. Just the deposits

and such of its assets enough to cover its deposit liability. Q. Weren't all of the assets, except those included in schedules A and C, turned over to the State National Bank? A. Not at that time. Q. How long after that were they? A. Why, along at times, at three or four times. Q. From time to time? A. Yes, sir; and I think there was a part of them sold to the St. Louis Bank. Q. And the proceeds turned over? A. No; the proceeds were used by Mr. Lacy in liquidating the stock. Q. And will you explain to the court just what you mean by 'liquidating the stock? A. Well, when the Oklahoma City National Bank liquidated—when it went out of business, it agreed with its stockholders that each stockholder having $1,000 worth of stock could get $1,200 in cash for his stock, or, by putting up $300 additional, he could get $1,000 worth of stock in the State National Bank. Q. In other words, he might take $120 for a par value of $100 a share, in money, for the stock which he held in the Oklahoma City National Bank, or, if he preferred to take stock in the consolidated institution to be known as the State National Bank, that would cost him $150, and he would have to put up his one share plus $30 in order to get it? A. Yes, sir. Q. Now, I also understand you to say that the liquidating agent took enough money and assets of the Oklahoma City National Bank to pay out $600,000 to the stockholders? A. He took all except the deposit liabilities. Q. Now, how much did all of that amount to? What were the total assets, in the first place, of the Oklahoma City National Bank prior to the date of this liquidation? A. Practically $2,250,000. Q. Then, all except about a million and a half went to Lacy, liquidating agent? A. All except enough to pay the deposits."

From the evidence four facts are indisputably established, that is to say, that the State National Bank, the defendant, asssumed only the deposit liabilities of the Oklahoma City National Bank, having purchased from said bank said deposits, that no part of the debt or debts

owing by Mr. Holcomb to the Oklahoma City National Bank was or were in any manner connected with a deposit liability, that .there was no agreement between the defendant and the Oklahoma City National Bank by which the former was to assume any of the liabilities of the latter except deposit liabilities, and that no part of the money borrowed from the plaintiff by Mr. Holcomb ever came into the possession of the defendant.

The trial court having heard all the evidence adduced at the trial before the jury on the part of the plaintiff, sustained a demurrer to said evidence interposed at that point of the proceedings by counsel for defendant, and in doing so made the following observations to the jury in directing a verdict against the plaintiff and in favor of the defendant:

"By the Court: Gentlemen of the Jury: The plaintiff has introduced her evidence in this case in support of her contention that a liability existed in her favor against the Oklahoma City National Bank, upon a guaranty that was made· by the vice president of that bank, in consideration of her making a loan to Mr. Holcomb of $2,000, upon the security which was furnished by him at the time—some $2,000 par value bonds of the Putnam Company. The contention is also made by the plaintiff, through her attorneys, that by the transaction between the Oklahoma City National Bank and the State National Bank, there was effected a consolidation of these two national banks—the one taking the assets of the other, and consolidating the two entities into one, making one. corporation of them, under the name of the State National Bank, and that the State National thereby became liable, in law, for the payment of all the liabilities of the Oklahoma City National, whether it had agreed to pay them or not. These are the contentions of the plain-

tiff, and evidence has been introduced by the plaintiff in support of these two contentions.

"The court has considered a demurrer to the evidence which was interposed by the defendant, which is merely the method of the defendant presenting to the court, instead of to the jury, the legal question as to whether, admitting all of the evidence that the plaintiff has introduced to be true—as to whether or not the defendant corporation is liable to the plaintiff upon this obligation that she sues upon.

"The evidence—the undisputed evidence here is, that the State National Bank authorized its president to purchase the assets of the Oklahoma City National Bank, except such assets as the National Banking Law prohibited a national bank from acquiring; and to assume the deposit liabilities of the Oklahoma City National. In other words, the board of directors authorized its president to do that which the board itself might have done by resolution.

"The Oklahoma City National Bank, upon this matter being presented to them, the directors of the latter bank adopted a resolution accepting the offer that was made by the president of the State National; the terms of which are not disclosed, except as in this resolution to which I have just called attention. The evidence does not disclose what the real agreement between these two presidents (of the State National and the Oklahoma City National) was with reference to the purchase of the assets of the Oklahoma City National, but the evidence is clear that all of the deposits that were in the Oklahoma City National were transferred to the State National, and the latter bank assumed and agreed to pay those deposits, amounting to somewhere in the neighborhood of a million and a half dollars. The evidence is also undisputed that assets of the Oklahoma City National, to the amount of these deposits, were transferred by the Oklahoma City National to the State National Bank, in consideration of

the assumption of this indebtedness, but that all of the balance of the assets of the Oklahoma City National were placed in the hands of Mr. Lacy, as a liquidating agent of the Oklahoma City National, and that these assets amounted to somewhere in the neighborhood of $700,000 or $750,000—the total assets being something like $2,250,000, as I remember the evidence. The stock of the Oklahoma City National Bank was $500,000, or, at least, about that, and by an agreement which was entered into by those interested therein, this stock of the Oklahoma City National Bank was redeemable through Mr. Lacy at $1.20 for every dollar of stock, or $1,200 for every thousand dollars of stock which a stockholder held in Oklahoma City National; and Mr. Lacy was to pay that out of the assets which he held as liquidating agent of the Oklahoma City National. He issued checks for this $1.20 for each dollar of stock—$120 for $100 shares and $1,200 for $1,000 in stock, as the case might be, and if a stockholder in the Oklahoma City National desired to get the cash on his stock; in other words, to sell it for $1.20 or a premium of 20 per cent., Mr. Lacy gave him a check for the amount. If, instead of selling his stock at that, he desired to become a stockholder in the State National Bank, under an arrangement that was made there between these parties (presumably between the presidents, as there is no other authority seems to have been given to any one else, or to have been taken by the directors of either) he could put up $30 for each $100 of stock that he held, and the liquidating agent, Mr. Lacy, took the $120 check which he wrote for that share of stock of $100 and the $30 in cash that the stockholder gave him, making $150 in value, and turned it into the State National Bank, and the State National Bank issued one share of stock for that $150 in value, the State National Bank getting $150 in cash for each share of stock that it issued to each of these stockholders in the Oklahoma City National Bank; and, in that way, as I understand the evidence, all of the stock of the Oklahoma City National was taken up. Whether

I am correct in that or not, I don't know, or whether that was the presumption of the witness that it all had been taken up; whether there is any money remaining in the hands of this liquidating agent with which to pay any liabilities of the Oklahoma City National the evidence doesn't disclose.

"The court is of the opinion that the Oklahoma City National Bank, as it received a portion of the money that was loaned to Mr. Holcomb by Mrs. Ezzard, upon this guaranty of the vice president of the Oklahoma City National, became liable, not by virtue of that guaranty, but in equity it was liable to Mrs. Ezzard for an amount equal to the amount which the Oklahoma City National received of that loan; and the testimony is that there was at least $1,000 of it that was received. All of the money, or at least a greater portion of it—possibly all of it—was paid into the Oklahoma City National. How it was to be applied there, if the matter went to the jury, would be for them to determine, if they could. from this evidence— over and above the $1,000.

"In case of a consolidation of banks, where one of them takes over all of the assets of the other and the stockholders of the old become stockholders in the new it is a consolidated affair which is liable for all of the debts of each of the two former corporations.

"The court is of the opinion, under this evidence, that there was no consolidation of these banks, but that the State National Bank purchased $1,500,000 of assets of the Oklahoma City National and assumed and agreed to pay $1,500,000 of its liabilities in the way of deposits, and that that was closed up. and that if there is any other money in the hands of the liquidating agent that hasn't been properly disbursed, this plaintiff is entitled to recover the amount of money which the Oklahoma City National recovered or received of this $2,000 loan which the plaintiff made to Mr. Holcomb. If that money has been exhausted in paying off stockholders of the Oklahoma City National,

the court is of the opinion that those stockholders are liable for the amount of that indebtedness, whatever it may be; but that a recovery cannot be had in this action, and that no cause of action has been established here, by the evidence, against the State National Bank, and the demurrer to the evidence is sustained and the action is dismissed at the cost of plaintiff—which leaves nothing for the jury to consider in this case, and you may be discharged from further consideration of this case, and an exception is, of course, allowed to the plaintiff."

This, we think, is a correct statement of the law based upon the facts as proven by the evidence upon the trial of this cause.

"With respect to the liability of the consolidated corporation it is important to distinguish a consolidation proper and the purchase of the assets of one corporation by another. In the latter case the liability of the purchasing corporation is very similar to the liability of an individual who purchases the assets of a debtor, and it does not, by reason of the purchase merely, become liable for the debts of the selling corporation; and unless the purchase can be attacked as in fraud of the creditors of the selling corporation, the purchasing corporation holds the property purchased free from any claim on the part of the creditors of the selling corporation; and this rule applies to a corporation which succeeds to the property and rights of another corporation, through the medium of a sale on a decree of foreclosure. So it may be stated as a general rule that in order to render the purchasing company personally liable for the debts of the selling corporation, it must appear that: (a) There be an agreement to assume such debts; (b) the circumstances surrounding the transaction must warrant a finding that there was a consolidation of the two corporations; or (c) that the purchasing corporation was a mere continuation of the selling corporation; or (d) that the transaction was fraudulent in fact. * * * The Legislature in authorizing one corporation to purchase

the stock and assets of another corporation may impose on [sic] the liability for the obligations of the corporation thus absorbed. And it has been held that where the statute provides that in the event of the purchase by one corporation of the capital stock and assets of another, the purchasing corporation shall become liable for the obligations of the selling corporation, the former is liable to a suit in equity to compel the payment of judgments against the latter, though it was ignorant thereof at the time of the purchase. So where .one corporation purchases the property and assets of another corporation, it may by express agreement impose on itself a liability for the debts and liabilities of the latter, the extent of the liability of the purchasing corporation depending, of course, on the terms of the agreement." ·(7 R. C. L. sec. 156; *Denver, etc., R. Co. v. Hannegan,* 43 Colo., 122, 95 Pac. 343, 16 L. R. A. (N. S.) 874, 127 Am. St. Rep. 100; *Capital Traction Co. v. Offutt,* 17 App. Cas. (D. C.) 292, 53 L. R. A. 390; *W. E. Austin Co. v. T. L. Smith Co.,* 138 Ga. 651, 75 S. E. 1048, Ann. Cas. 1913E, 1042 and note; *Luedecke v. Des Moines Cabinet Co.,* 140 Iowa, 223, 118 N. W. 456, 32 L. R. A. [N. S.] 616 and note; *Whiting v. Malden, etc., R. Co.,* 202 Mass. 298, 88 N. E. 907, 132 Am. St. Rep. 493; *Vicksburg, etc., Telephone Co. v. Citizens' Telephone Co.,* 79 Miss. 341, ·30 South. 725, 89 Am. St. Rep. 656; *Missouri Lead Min., etc., Co. v. Reinhard,* 114 Mo. 218, 21 S. W. 488, 35 Am. St. Rep. 746; *Midland Ry. Co. v. Fisher,* 125 Ind. 19, 24 N. E. 756, 8 L. R. A. 604, 21 Am. St. Rep. 189; *Billmyer Lumber Co. v. Merchants' Coal Co.,* 66 W. Va. 696, 66 S. E. 1073, 26 L. R. A. [N. S.] 1101.)

"It is well settled that where the new company formed by a consolidation assumes or has imposed on it the liabilities of the constituent corporations, a creditor of one of the constituent corporations may enforce his claim directly against the consolidated corporation in an action at law. No previous action against the old corporation is necessary, nor is a suit in equity required." (7 R. C. L. sec. 159; *Atlantic, etc., Ry. Co. v. Johnson,* 127 Ga. 392,

56 S. E. 482, 11 L. R. A. [N. S.] 1119 and note; *Berry v. Kansas City, etc., R. Co.,* 52 Kan. 759, 774, 34 Pac. 805, 36 Pac. 724, 39 Am. St. Rep. 371, 381.)

The defendant assumed none of the liabilities of the Oklahoma City National Bank except deposit liabilities, and no other liability of the constituent corporation has been imposed upon it by law.

"It is held without dissent that a sale by one corporation to another of part or all of its assets, in good faith and for a valuable consideration, does not of itself impose on the buying corporation any liability for the debts of the seller. *Spear Min. Co. v. Shinn,* 93 Ark. 346, 124 S. W. 1045; *Denver, etc., R. Co. v. Hannegan,* 43 Colo. 122, 95 Pac. 343, 16 L. R. A. (N. S.) 874, 127 Am. St. Rep. 100; *Hawkins v. Central of Georgia R. Co.,* 119 Ga. 159, 46 S. E. 82; *Louisville, etc., R. Co. v. Hughes,* 134 Ga. 75, 67 S. E. 542; *White v. Atlanta, etc., R. Co.,* 5 Ga. App. 308, 63 S. E. 234; *Anderson v. War Eagle Consolidated Min. Co.,* 8 Idaho, 789, 72 Pac. 671; *Bruffett v. Great Western R. Co. of 1859,* 25 Ill. 353; *Luedecke v. Des Moines Cabinet Co.,* 140 Iowa, 223, 118 N. W. 456, 32 L. R. A. (N. S.) 616; *Chase v. Michigan Telephone Co.,* 121 Mich. 631, 80 N. W. 717; *Swing v. Empire Lumber Co.,* 105 Minn. 356, 117 N. W. 467; *Hageman v. Southern Electric R. Co.,* 202 Mo. 249, 100 S. W. 1081; *Abilene Cotton Oil Co. v. Anderson,* 41 Tex. Civ. App. 342, 91 S. W. 607. 'The mere transfer of the assets of one corporation to another does not constitute a legal identity between them; and if one corporation becomes the *bona fide* owner in a lawful mode of the assets of any property of another corporation, it does not thereby become liable for the debts of the latter corporation.' *Spear Min. Co. v. Shinn,* 93 Ark. 346, 124 S. W. 1045. 'It is very plain that in the absence of a statutory provision on the subject, the acquisition of all the stock, property, and assets of a corporation by an individual or by another corporation, does not of itself make the new holder liable to pay the debts of

the corporation.   A mere purchase of such capital stock
and assets is a taking of a title, which leaves unsecured
creditors with no claim against the purchaser, and with
no means of collecting their debts except from the cor-
poration itself.'   *Whiting v. Malden, etc., R. Co.*, 202 Mass.
298, 88 N. E. 907 [132 Am. St. Rep. 493].   In *Vicksburg,
etc., Telephone Co. v. Citizens' Telephone Co.*, 79 Miss. 341,
30 South. 725, 89 Am. St. Rep. 656, the court said: 'Where
there has been neither a consolidation nor a merger, but
a mere sale by one corporation of its property to another,
that sale   *   *   *   if made for a valuable consideration,
in good faith, will pass the property of the selling corpo-
ration to the purchasing corporation free from claims of
mere simple contract creditors.'   So, too, in *Luedecke v.
Des Moines Cabinet Co.*, 140 Iowa, 223, 118 N. W. 456,
32 L. R. A. (N. S.) 616, the rule was stated as follows:
'In order to render the purchasing company personally lia-
ble for the debts of the selling corporation, it must appear
that: (a) There be an agreement to assume such debts;
(b) the circumstances surrounding the transaction must
warrant a finding that there was a consolidation of the
two corporations; (c) that the purchasing corporation was
a mere continuation of the selling corporation; or (d)
that the transaction was fraudulent in fact.'   In *Hawkins
v. Central of Georgia R. Co.*, 119 Ga. 159, 46 S. E. 82,
the court said:   'As to claims against one corporation
whose property has been purchased by another, the general
law would apply, prohibiting any transaction in fraud of
creditors, and preventing an assignment by an insolvent
wherein it or the stockholders reserved any benefit or
trust.   Civil Code, sec. 2695, pars. 1, 2.   But in other re-
spects an out and out sale of the property of the corpora-
tion is not different from a case in which an individual
sells visible property subject to levy, in exchange for cash
or negotiable instruments which may be put beyond the
reach of the levying officer.   When a railroad has a right
to sell, the ordinary incidents of a sale attach; and assum-
ing that it is in good faith and for a fair value, the buyer

is not responsible for more than the purchase price. The law does not exact the payment of the vendor's debts by the vendee, as a condition precedent to the exercise of the power of sale.' In *Taenzer v. Chicago, etc., R. Co.*, 170 Fed. 240, 95 C. C. A. 436, wherein it did not appear whether the property was acquired by purchase, lease, or consolidation, the court said: 'No cases are cited and we know of none, which support the proposition that a suit is maintainable at law against a successor corporation, through lease or purchase, for recovery of damages on account of a prior default of the original contracting corporation, without proof either of an express assumption of liability by the successor corporation, or that the possession of the assets of such corporation was obtained by virtue of some relation by which liability for the prior obligations of such corporation is imposed by statute. On the contrary, the authorities are express that neither a lessee nor a purchaser becomes liable for the prior debts or obligations of the lessor or vendor, in the absence of either express contract or statutory provision therefor.' " (Note to *Austin v. Smith*, Ann. Cas. 1913E, 1042, 1044.)

See *W. E. Austin Co. v. T. L. Smith Co.*, 138 Ga. 651, 75 S. E. 1048, Ann. Cas. 1913E, 1042.

Taking this view of the law as applied to the facts proven in this particular case, it does not become necessary to pass upon any of the other questions raised by counsel in their respective briefs herein.

The action of the trial court in sustaining the demurrer to the plaintiff's evidence at the close of same upon the trial, and in directing the jury to return a verdict in favor of the defendant and against the plaintiff, and in rendering judgment on said directed verdict in favor of defendant and against plaintiff, with costs of suit, was

proper and without error, and the judgment of the lower court is therefore ordered affirmed.

By the Court: It is so ordered.